**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Maura D. Corrigan

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 22, 2004**

LINDA M. GILBERT,

    Plaintiff-Appellee,

v                        No. 122457

DAIMLERCHRYSLER CORPORATION,

    Defendant-Appellant.

_____

**BEFORE THE ENTIRE BENCH**

**YOUNG, J.**

In this appeal, defendant seeks reversal or remittitur of the largest recorded compensatory award for a single-plaintiff sexual harassment suit in the history of the United States. The $21 million verdict awarded, according to plaintiff, barely compensates her for the lasting effects of the sexual harassment she endured as an employee of defendant, DaimlerChrysler, by whom she is still employed and earning almost $100,000 a year. She contended during her trial that defendant's failure to deal adequately with sexual harassment in her plant led to a

1

permanent change in her "brain chemistry" and a relapse into substance abuse and depression, and that these conditions will soon lead to her untimely and excruciating death.

The foundation for this theory of recovery was laid by the expert opinion testimony of a social worker who had a longstanding relationship with plaintiff's counsel. This witness not only lacked any training, education, or experience in medicine, but also testified falsely about his credentials. Nevertheless, plaintiff asked the jury to treat this witness's testimony as a "prognosis," and to compensate plaintiff for the loss of her health and, eventually, her life. Plaintiff's counsel evoked images of physical abuse and torture, compared his client to survivors of the Holocaust, and argued that defendant DaimlerChrysler thought of itself as "God Almighty," exempt from the legal norms that govern others. Thus, in defendant's view, the verdict was the product of inflammatory rhetoric, unscientific "expert" testimony, fraud on the court, and attorney misconduct.

We granted leave to appeal in order to determine whether the verdict was a legitimate estimate of plaintiff's losses, as plaintiff contends, or whether it was, as defendant argues, an unjust, excessive award

2

procured through systematic misconduct by plaintiff's trial counsel and supported by dubious evidence. The majority and the dissent agree on one fundamental fact: the verdict rendered in this case is excessive and cannot be affirmed.[1]

A careful review of the record reveals that plaintiff's trial counsel engaged in a sustained and deliberate effort to divert the jury's attention from the facts and the law. In their stead, counsel interposed

---

[1] We differ not, as the dissent suggests, because we believe that the plaintiff has failed to make out a case of sexual harassment worthy of a verdict. We differ instead because we believe that *this* verdict is excessive and because we have concluded that the record supporting this verdict is the result of plaintiff counsel's repeated invitation to the jury to exercise its collective prejudices in preference to fairly compensating plaintiff on the evidence presented. For all of the reasons detailed in this majority opinion, we conclude that the repeated, explicit and inappropriate references to the Holocaust, defendant's German national origin, and defendant's status as a corporation cannot be tolerated in Michigan courts any more than in our society at large.

The people have declared in our Constitution that "equal protection of the laws" shall not be denied on the basis of national origin. Const 1963, art 1, § 2. See also, the Michigan Civil Rights Act, MCL 37.2101 *et seq*. The observance of this fundamental principle cannot stop at the door of the courthouse. Indeed, it is within the courthouse that we ought be most concerned that the merits of a party's cause, not its alienage or status, should remain the exclusive focus of a jury's deliberations. Thus, while we hold no brief for the inadequacies of defendant's counsel that the dissent has taken pains to note, defendant was entitled to a trial free of naked appeals to entice the jury to consider its passions and prejudice rather than the evidence.

misleading argument, prejudice-baiting rhetoric, and pleas for punitive damages. This rhetoric had its intended result: the jury's verdict unmistakably reflects passion rather than reason and prejudice rather than impartiality.

We conclude that the trial court lacked any justification for denying defendant's postverdict motion for a new trial under MCR 2.611. Thus, the trial court abused its discretion in denying defendant's motion for a new trial. We reverse, and we remand to the trial court for further proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

It is undisputed that plaintiff, Linda Gilbert, has long waged a losing battle with substance abuse. Her personal struggles were thoroughly documented in medical records that plaintiff introduced at trial in order to establish damages. According to those records, Ms. Gilbert began drinking at fourteen and began using cocaine at twenty years of age. Most of her adult life has since been marked by excessive drinking. At one point during her employment with defendant, she reported to her substance abuse counselors that she was consuming a pint to one-fifth gallon of alcohol a day. Her cocaine use also continued during her employment with defendant, as documented by

4

records from St. John Hospital and Sacred Heart Rehabilitation Center.

Ms. Gilbert sought professional assistance on a number of occasions and has been treated on both an inpatient and outpatient basis for substance abuse. On the basis of the testimony at trial, however, it appears that none of these treatments has been entirely successful. Indeed, the foundation of plaintiff's claim for $140 million in damages was the assertion that plaintiff's substance abuse would continue until it resulted in her death.

Plaintiff's work life contrasts markedly with her personal difficulties. In the mid-eighties, plaintiff began an apprenticeship to train for a career as a millwright. By 1990, plaintiff had become a journeyman millwright and was hired two years later by the Chrysler Corporation.[2] Plaintiff was the first female millwright to work at Chrysler's Jefferson North Assembly Plant in Detroit. To our knowledge, plaintiff continues to work for defendant and, according to her attorney, earns "nearly $100,000 per year" with overtime pay.

---

[2] Chrysler was a corporate predecessor of defendant DaimlerChrysler. In 1998, Chrysler merged with Daimler Benz AG to form DaimlerChrysler. DaimlerChrysler is the named defendant in this action.

Plaintiff initiated the present sexual harassment action against defendant on March 25, 1994, complaining that a hostile work environment existed in defendant's Jefferson North plant. At that time, plaintiff had reported two specific instances of harassment through defendant's formal discrimination reporting procedure. The first incident took place on May 22, 1993, a little over a year after plaintiff began working for defendant. Plaintiff reported that she found a lewd cartoon taped to her toolbox. It depicted a woman in a bar engaged in an "arm-wrestling" match with a man's penis. Plaintiff's name was written above the woman in the cartoon, and the name of a coworker was written on the man whose penis was being wrestled.[3]

After receiving plaintiff's oral report of this cartoon, plaintiff's supervisor and area coordinator apologized to plaintiff, stated that defendant "did not condone such action" and that they would address the problem by speaking with employees in the area and distributing copies of defendant's written policy against

---

[3] When plaintiff described the cartoon in a written report requested by defendant, she wrote that "[t]he woman was bare-breasted and about to perform fellatio. I was named as the woman. I was extremely insulted and degraded. The insinuation that this happens between myself and a man I work with everyday is humiliating."

sexual harassment. Defendant's internal memo notes that an employee in Chrysler's human resources department and several other employees spoke with the workers in plaintiff's area and distributed the company's sexual harassment guidelines following plaintiff's report.

The second reported incident took place on June 5, 1993, when plaintiff found a Polaroid photograph of a penis on her toolbox. She informed her supervisor about the picture. Defendant's internal memo concerning the complaint indicates that its supervisory employees apologized to plaintiff and reassured her that "[Chrysler did] not approve of such action, and that [Chrysler was] doing everything possible to prevent such harassment."

On the basis of these two incidents, plaintiff initiated a lawsuit against defendant alleging breach of contract, violations of the Michigan Civil Rights Act, MCL 37.2101 *et seq.,* and negligence in addressing plaintiff's concerns about sexual harassment in the workplace.[4]

After filing her lawsuit, plaintiff formally reported to management several other incidents of harassment that occurred while the suit was pending. Plaintiff reported

---

[4] The breach of contract and negligence claims were omitted from the pretrial order and were not presented to the jury.

7

that, on October 10, 1994, she found a vulgar cartoon entitled "Highway Signs You Should Know" taped to her locker;[5] she also reported that she had found an article by "Dr. Ruth" taped to her locker one week earlier.[6] In response, Maya Baker, a human resources facilitator for defendant, personally patrolled plaintiff's work area on occasion and also asked union leaders to share with union members that the responsible party could be terminated. Next, plaintiff reported that on March 12, 1995, she found a lewd and misogynistic "poem" on a bulletin board in a work area adjacent to hers.[7] Defendant investigated these latter two incidents and, being unable to determine the responsible party, removed the bulletin board.

Finally, on September 2, 1997, plaintiff formally reported that a coworker made references to his "big meat" in front of her. In response to plaintiff's complaint

---

[5] The cartoon contains a number of lewd drawings, each apparently meant sexually to illustrate "highway signs" such as "Dead End" and "Men at Work."

[6] The article by columnist Dr. Ruth Westheimer was a response to a man complaining that his penis was sore from having sexual intercourse too frequently.

[7] The "poem" is reproduced in the Court of Appeals' opinion. Unpublished opinion per curiam, issued July 30, 2002 (Docket No. 227392), pp 6-7.

about her coworker's apparent reference to his genitals, defendant reprimanded the responsible employee.

These are the only sexual harassment incidents that plaintiff made known to defendant through the formal procedures established by defendant for such matters. However, plaintiff contends that defendant had actual notice of other incidents because of her description of those incidents during her deposition testimony given after the commencement of this suit and that defendant had "constructive notice" of other incidents.[8]

Before trial, defendant moved to exclude "evidence regarding incidents that were never reported." After hearing argument on this motion, the court denied defendant's request and admitted testimony and evidence on these unreported incidents.

---

[8] Plaintiff testified, for example, that on her first day of work a coworker mentioned that he would like to hold a ladder for plaintiff if she were wearing a dress; that a coworker called her a "bitch" during a card game; that her toolbox was "blocked" when coworkers intentionally placed other equipment in front of it; that some coworkers ignored her or made false claims in order to get her in trouble with management; that a misogynistic cartoon was taped to her toolbox with the word "bitch" written on the tape; that a *Penthouse* article called "Why Men Have So Many Sperm" was set on a table next to her beverage; and that a liquid—which plaintiff now asserts was urine—was found on her chair.

At trial, plaintiff offered the testimony of social worker Carol Katz and of certified social worker and substance abuse counselor Steven Hnat. Mr. Hnat had counseled plaintiff regarding her substance abuse problems before the initiation of her lawsuit against DaimlerChrysler. He therefore testified as both a fact witness and an expert witness. His testimony proved to be the linchpin of plaintiff's case.

Mr. Hnat opined that the harassment experienced by plaintiff had caused irreversible changes in her brain chemistry, causing her to relapse into alcoholism and to develop "major depressive disorder." He testified that he had reviewed medical records prepared by other health professionals and, in his opinion, those records read "like a preview of [plaintiff's] death certificate." He further opined that plaintiff's body was beginning to "decompensat[e]," and that she was "clearly dying." Mr. Hnat's theory was that plaintiff would develop a fatal case of pancreatitis, a disease that Mr. Hnat testified was "the most painful way to die." In the end, he told the jury that plaintiff was likely to die relatively soon because of "medical complications," and that he "wouldn't bet on her living very long."

Thus, plaintiff's theory of the case, as introduced through Mr. Hnat, was that the sexual harassment plaintiff encountered at Chrysler caused a permanent change in her brain chemistry that produced a relapse into alcohol abuse and the onset of depression. These conditions, in turn, would lead inexorably to plaintiff's untimely and excruciating death.

After a six-week trial and 1-1/2 days of deliberation, the jury returned a verdict of $21 million in favor of plaintiff. With prejudgment interest, a judgment for more than $30 million was entered for plaintiff.

On October 29, 1999, defendant moved for judgment notwithstanding the verdict (JNOV), a new trial, remittitur, an evidentiary hearing, and relief from judgment. The motion argued, among other things, that plaintiff's counsel and Mr. Hnat had perpetrated fraud on the court through misrepresentations about Mr. Hnat's relationship with plaintiff's counsel and about his academic credentials. Mr. Hnat testified at trial that he received a master's degree in "psychobiology" from the University of Michigan, and that, as an undergraduate, he won the prestigious Pillsbury Prize in psychology. These claims were duplicated on a version of Mr. Hnat's resume that was introduced as a trial exhibit. In fact, both statements

11

were shown after trial to be false. Nevertheless, the trial court denied defendant's motions on May 1, 2000. The Court of Appeals affirmed the jury's verdict in an unpublished opinion.

On April 8, 2003, we granted defendant's motion for leave to appeal.[9]

On appeal to this Court, defendant asserts four major claims of error. First, DaimlerChrysler argues that plaintiff failed to state a claim of sexual harassment under the Michigan Civil Rights Act (CRA) because she did not show that defendant's response to the six reported incidents of sexual harassment was inadequate. Second, defendant argues that it is entitled to a new trial because of the persistent and blatant misconduct of plaintiff's trial counsel. Third, defendant maintains that the trial court committed error requiring reversal by admitting the opinion testimony of a social worker on medical issues and that this error was exacerbated by plaintiff's use of that testimony to inflame the jury. Finally, DaimlerChrysler argues that the $21 million verdict received by plaintiff

---

[9] 468 Mich 883 (2003). We also granted motions from the Michigan Chamber of Commerce and the United States Chamber of Commerce to file briefs amicus curiae, and solicited additional briefs amicus curiae from interested parties.

12

is so excessive and so clearly punitive that it is entitled to remittitur.

## II. ANALYSIS

### A. STANDARD OF REVIEW

A trial court's decision to grant or deny a motion for a new trial under MCR 2.611 is reviewed for an abuse of discretion.[10] The determination that a trial court abused its discretion "involves far more than a difference in judicial opinion."[11] Rather, a court abuses its discretion "when 'an unprejudiced person' considering 'the facts upon which the trial court acted, [would] say that there was no justification or excuse for the ruling made.'"[12]

### B. DEFENDANT'S MOTION FOR A NEW TRIAL

Defendant moved for postjudgment relief on a number of grounds. One of the grounds was that the verdict was the product of prejudice and passion. According to defendant, plaintiff's counsel had repeatedly equated plaintiff's experiences to those of the victims of the Holocaust, and

---

[10] *Kelly v Builders Square, Inc*, 465 Mich 29, 34; 632 NW2d 912 (2001).

[11] *Alken-Ziegler, Inc v Waterbury Headers Corp,* 461 Mich 219, 227; 600 NW2d 638 (1999).

[12] *People v Hendrickson,* 459 Mich 229, 235; 586 NW2d 906 (1998) (opinion by KELLY, J.), quoting *Detroit Tug & Wrecking Co v Wayne Circuit Judge,* 75 Mich 360, 361; 42 NW 968 (1889).

13

thereby associated defendant's new German co-owners with the Nazis who perpetrated that horror. This argument, according to defendant, was bolstered by the expert testimony of a social worker who suggested to the jury that sexual harassment had altered plaintiff's "brain chemistry" and would lead to her untimely and agonizing death. Defendant argued that the excessiveness of the verdict—a $21 million award—palpably reflected the passion and prejudice that plaintiff sought to instill in the jury.

The trial court had the discretion to grant this request for a new trial under MCR 2.611(A)(1), which provides:

> A new trial may be granted to all or some of the parties, on all or some of the issues, whenever their substantial rights are materially affected, for any of the following reasons:
>
> (a) Irregularity in the proceedings of the court, jury, or prevailing party, or an order of the court or abuse of discretion which denied the moving party a fair trial.
>
> (b) Misconduct of the jury or of the prevailing party.
>
> (c) Excessive or inadequate damages appearing to have been influenced by passion or prejudice.
>
> (d) A verdict clearly or grossly inadequate or excessive.
>
> (e) A verdict or decision against the great weight of the evidence or contrary to law.

(f) Material evidence, newly discovered, which could not with reasonable diligence have been discovered and produced at trial.

(g) Error of law occurring in the proceedings, or mistake of fact by the court. . .

An objective review of the proceedings below leads to the conclusion that the trial court abused its discretion in failing to grant a new trial under MCR 2.611(A)(1)(c). The jury verdict is so excessive and so clearly the product of passion and prejudice that there can be no justification for the trial court's denial of defendant's motion for a new trial.

## 1. AN "EXCESSIVE" VERDICT

In order to grant relief under MCR 2.611(A)(1)(c), it is first necessary to determine whether the verdict is "excessive." Because subsection c does not define this term, it must be given its "plain and ordinary meaning[]."[13] "Excessive" is defined as "going beyond the usual, necessary, or proper limit or degree; characterized by excess."[14] In the context of compensatory damages, the determination whether damages exceed the "necessary or proper limit" is no simple task. "[T]he authority to

---

[13] *Koontz v Ameritech Services, Inc,* 466 Mich 304, 312; 645 NW2d 34 (2002).

[14] Random House Webster's Unabridged Dictionary (2001).

15

measure damages," as we stated in *Kelly v Builder's Square,* "inheres in the jury's role as trier of fact."[15]  Because the amount required to compensate a party for pain and suffering is imprecise, that calculation typically belongs to the jury.[16]

The difficulty of reviewing damage awards, however, does not undermine the judicial obligation to do so under MCR 2.611.  A reviewing court is therefore faced with the task of ensuring that a verdict is not "excessive" without concomitantly usurping the jury's authority to determine the amount necessary to compensate an injured party.  Given the impossibility of using a simple algorithm for this task, judicial review of compensatory awards must rely on the fundamental principle behind compensatory damages—that of recompensing the injured party for losses proven in the record.

This, in effect, is the rationale behind three of the four factors that a majority of this Court endorsed in *Palenkas v Beaumont.*[17]  The *Palenkas* majority stressed that appellate review of jury verdicts must be based on

---

[15] *Id.* at 34.

[16] *Id.* at 35.

[17] 432 Mich 527, 533; 443 NW2d 354 (1989).

*objective* factors and firmly grounded in the record.[18] Accordingly, judicial review of purportedly excessive jury verdicts should focus on the following objective factors:

> [1] whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; [2] whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; [and 3] whether the amount actually awarded is comparable to awards in similar cases within the state and in other jurisdictions.[19]

When a verdict is procured through improper methods of advocacy, misleading argument, or other factors that confound the jury's quantification of a party's injuries, that amount is inherently unreliable and unlikely to be a fair estimate of the injured party's losses. Likewise, when a verdict is unsupported by the record or entirely inconsistent with verdicts rendered in similar cases, a reviewing court may fairly conclude that the verdict exceeds the amount required to compensate the injured party.

When analyzing a verdict according to the *Palenkas* factors, courts must be mindful of the fact that punitive damages are available in Michigan *only* when expressly

---

[18] *Id.* at 532-33.

[19] **Id.**

authorized by the Legislature.[20]  Here, the Civil Rights Act

does not authorize punitive damages—and, moreover, permits

compensation only for "injury or loss caused by each

violation of this act, including reasonable attorney's

fees."[21]  Thus, the court has a statutory obligation under

the CRA to ensure, through consideration of the objective

factors described by *Palenkas*, that this damage award

serves the ends articulated by the Legislature.[22]

We turn first to the question "whether the verdict was

the result of improper methods, prejudice, passion,

partiality, sympathy, corruption, or mistake of law or fact

---

[20] *Rafferty v Markovitz*, 461 Mich 265, 270-271; 602 NW2d 367 (1999).  Punitive damages are authorized, for example, by MCL 750.147.

[21] MCL 37.2801(3).

[22] There is also an overarching constitutional issue to consider.  In *State Farm Mut Automobile Ins Co v Campbell,* 538 US 408, 416; 123 S Ct 1513; 155 L Ed 2d 585 (2003), the United States Supreme Court concluded that "[t]he Due Process Clause of the [United States Constitution's] Fourteenth Amendment prohibits imposition of grossly excessive or arbitrary punishments on a tortfeasor."  While *State Farm* dealt with punitive damage awards, the due process concerns articulated in *State Farm* are arguably at play regardless of the label given to damage awards.  A grossly excessive award for pain and suffering may violate the Due Process Clause even if it is not labeled "punitive."  In this case, however, there is no need to reach this constitutional question, given the necessity of reversal on other grounds.

18

. . ."[23]   As shown in greater detail in Part II(B)(2), we have concluded that this verdict was the product of misleading argument, inflammatory rhetoric, and the improper admission of expert opinion testimony utterly lacking in scientific support.[24]   The first *Palenkas* factor listed above therefore provides strong support for the conclusion that this verdict is "excessive," as that term is used in MCR 2.611(A)(1)(c).

The second *Palenkas* factor addresses "whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained . . ."[25]   This inquiry into the reasonableness of the verdict concerns, in essence, whether the verdict is supported by the record.   Here, it is apparent that the jury verdict is unsupported by the evidence in one sense.

---

[23] Palenkas, supra at 532.

[24] The excessiveness of the verdict alone provided a sufficient basis for the trial court to grant a new trial under MCR 2.611(A)(1)(d).   But the true abuse of discretion below was not just the trial court's failure to recognize that this verdict was excessive as measured by comparable cases, but its failure to recognize that plaintiff's counsel had engaged in a *deliberate attempt to inflame the jury*—that the verdict below was the product of an intentional course of improper conduct.   Therefore, this opinion focuses on defendant's motion for a new trial under subsection c.

[25] Palenkas, supra at 532.

19

The jury awarded plaintiff $1 million in trust for future medical expenses and "loss of future earning capacity," despite the fact that plaintiff failed to demonstrate any economic harm in the present, much less a "loss of future earning capacity." In fact, according to her counsel, plaintiff continues to earn almost $100,000 a year with overtime pay as an employee of defendant. Similarly, there was no evidence regarding the nature of medical treatment that plaintiff may have to undergo in the future or the likely cost of that treatment. The jury's estimation of plaintiff's future economic loss was without support in the record.

The remainder of the verdict—$20 million—was intended to compensate plaintiff for emotional distress, "physical pain and suffering," and the aggravation of her substance abuse. There may be some cases in which it is possible to determine objectively that a compensatory award is or is not supported by the record. But this determination is extremely problematic where damages for emotional distress are at issue. In such cases, comparison with damage awards in comparable cases in this jurisdiction and beyond—the final *Palenkas* factor—becomes most relevant. While the resultant analysis is certainly imperfect, other damage awards may provide a range of what constitutes reasonable

compensation for the type of injury suffered by a plaintiff. With this range in mind, the reviewing court may determine whether the verdict appears to be "within the limits of what reasonable minds would deem just compensation for the injury sustained . . ."[26]

Turning finally to the third *Palenkas* factor, the $21 million verdict awarded in this case is far beyond the range of what other juries have determined to be reasonable compensation for injuries similar to—and much worse than—those suffered by plaintiff. To our knowledge, plaintiff's $21 million verdict is the largest amount ever awarded for a single-plaintiff sexual harassment claim in the United States. It is seventy times larger than the maximum award permitted under title VII, the federal civil rights act.[27] Indeed, plaintiff has not cited a *single* compensatory verdict in an employment discrimination action from any court within the United States that arguably rivals the amount awarded to plaintiff.

In responding to defendant's argument that the $21 million verdict is "the largest single-plaintiff sexual

---

[26] *Id.* at 532.

[27] See 42 USC 1981a(b)(3)(D).

harassment award upheld on appeal anywhere in the entire country," plaintiff has argued to this Court:

> Defendant's "other sexual harassment" case analysis is far from honest. Looking only at automobile companies, and ignoring every other case of sexual harassment in any other field of employment in the Country, the largest recovery is a $34,000,000 <u>settlement</u> by Mitsubishi in June of 1998. . . . While Daimler Chrysler may believe that sexual harassment of women is acceptable and insignificant, other automobile manufacturers recognize their responsibilities and the gravity of injury by agreeing to high seven and eight figure settlements to avoid the higher measure of full redress available to a victim like Linda Gilbert who recovers for all losses at trial.

Plaintiff's attack on defendant's "dishonesty" here omits a crucial fact: Mitsubishi's $34 million settlement was in a *class action*.[28] We are unaware, therefore, of any single-plaintiff employment discrimination verdict involving a nonpunitive award that even arguably approaches the amount awarded to plaintiff, and plaintiff has identified none.

Plaintiff argues that this discrepancy between her verdict and every other sexual harassment verdict in United States simply reflects the jury's recognition that defendant's conduct was much, much worse than that of any other defendant in a sexual harassment case. While we have

---

[28] See, e.g., Braun, *Mitsubishi to Pay $34 Million in Sex Harassment Case*, Los Angeles Times (June 12, 1998), p A1 (noting that the settlement was distributed among "hundreds of female employees").

22

no doubt that plaintiff encountered truly ugly conduct at Chrysler given the evidence and testimony adduced at trial, we cannot accept the argument that plaintiff's was the *worst* case of sexual harassment in the history of the country that has resulted in a verdict.

A survey of verdicts rendered in other sexual harassment suits reveals that plaintiffs who endure sexual harassment in its most aggressive form—unwanted touching and persistent, predatory sexual advances—uniformly have received far less in compensatory damages than the amount awarded to plaintiff. For example, in *Griffin v City of Opa-locka,* a party who alleged that she was sexually harassed during a four-month period and was raped by her manager was awarded $2 million.[29] And in *Grow v W A Thomas Co,* the plaintiff alleged that she was subjected to "sexually explicit comments and unwanted kissing and groping" over several years and recovered $192,684.[30]

Indeed, the only plaintiffs who have recovered sexual harassment verdicts that are even arguably comparable to that rendered in this case are those who recovered *punitive*

---

[29] **261 F3d 1295 (CA 11, 2001).**

[30] **236 Mich App 696, 700; 601 NW2d 426 (1999).**

damages.[31] Even among cases in which a plaintiff recovered punitive damages for sexual harassment, our research discloses no case in which a party recovered a punitive award that approached or exceeded $21 million that was upheld on appeal.[32]

On the basis of three of the factors articulated by this Court in *Palenkas,* we conclude that the verdict in this case is "excessive" as that term is used in MCR 2.611. Not only does the verdict exceed verdicts in similar cases by leaps and bounds, but, as shown in this opinion, it was awarded by a jury inflamed by hyperbolic rhetoric, prejudice-baiting argument, and unscientific expert testimony.

---

[31] See *Weeks v Baker & McKenzie,* 63 Cal App 4th 1128; 74 Cal Rptr 2d 510 (1998) (the plaintiff, who alleged that she sustained psychological injury from sexual harassment, recovered $50,000 in compensatory damages and approximately $7 million in punitive damages; the latter amount was later reduced to $3.5 million); *Deters v Equifax*, 981 F Supp 1381 (D Kan, 1997) (plaintiff, whose coworkers rubbed and kissed her against her will, received $5,000 in compensatory damages and $1 million from the jury, reduced to $300,000 cap under 42 USC 1891a[b]), aff'd 202 F3d 1262 (CA 10, 2000).

[32] See, e.g., *Channon v United Parcel Service, Inc,* 629 NW2d 835, 851 (Iowa, 2001) (the plaintiff, who was subjected to unwelcome touching, sexual comments, and assault, was awarded a verdict including approximately $530,000 in compensatory damages and $80,220,000 in punitive damages—the latter of which was reduced to $300,000 under title VII).

24

## 2. PASSION AND PREJUDICE

Having determined that the verdict is excessive, we also conclude excessiveness may be attributed to the effect of plaintiff's efforts to cause the jury to act on passion and prejudice. An objective review of the record leads to an unavoidable conclusion: plaintiff's counsel engaged in a systematic effort to divert the jury from its true task—that of appropriately compensating the plaintiff for any losses suffered as a result of defendant's violation of the CRA—and instead sought to inflame passion and to incite the jury to punish the defendant even while disclaiming that he was seeking punitive damages.

Plaintiff's counsel deliberately tried to provoke the jury by supplanting law, fact, and reason with prejudice, misleading arguments, and repeated *ad hominem* attacks against defendant based on its corporate status. Given the undeniable role of this inflammatory rhetoric, the trial court erred in denying defendant's motion for a new trial.[33]

One of counsel's tactics in this vein was his repeated attempts to equate plaintiff with the victims of the

---

[33] See *Firchau v Foster,* 371 Mich 75, 78, 79; 123 NW2d 151 (1963) ("[W]here language is such as evinces a studied purpose to enflame or prejudice the jury, based upon facts not in the case, this Court has not hesitated to reverse.").

25

Holocaust.  This association began during the testimony of plaintiff's expert, Steven Hnat, when Mr. Hnat testified that plaintiff's psychological state was akin to that of concentration camp survivors.  Plaintiff's counsel further developed this theme during his closing argument:

> Never again.  Never again.  That is a line now used by the sabreurs [sic; sabras] in Israel, the land of Israel, to mean that the unspeakable horrors that were perpetrated on the people of Israel, on the Jews, must never be forgotten and must never happen again.  Never again.  Never again.

Counsel also exhorted the jury to

> provide full and complete justice and thereby, as I indicated at the start of this trial, raise the roof of this courthouse so that justice will ring loud and clear.  No more.

> As those young [sabras] said in the land of Israel, no more.  We will not let this stand.  We will not allow this to pass.  We will not allow you, you, an equal with all of us in this, the great equalizer, to crush the health and the dreams of a woman who simply had the American dream.

Even the final sentence of plaintiff's closing argument referenced the Holocaust theme: "Let's bury this prejudice once and for all so that we may appropriately say, never again."

This recurring rhetorical theme was especially virulent given the context of plaintiff's trial.  In 1998, Chrysler had merged with Daimler Benz AG, a German

26

automobile manufacturer.  The merger was highly publicized—particularly in metropolitan Detroit, where plaintiff's trial was held.  And if any of the jurors had failed to hear about the merger through media outlets, they were privy to the news once plaintiff's counsel pointed out during his closing argument that Chrysler was under German ownership:

> Daimler-Chrysler may be powerful, but, my God, they are going to have to recognize, hopefully today by your verdict, that not only must they face justice in this case, they must obey the law.
>
> We are a nation of laws, not powerful individuals.  We are a nation of laws . . .
>
> And, I can assure that verdict will be heard from the floor of that plant on Jefferson to the board room in Auburn Hills or Stuttgart. . . .
>
> Once they hear in Auburn Hills and in Germany about Linda . . . it will stop.

Continuing on this theme, counsel argued that the jury now had a chance to acquaint Chrysler's German owners with a distinctly *American* brand of justice:

> [You must] ring that bell of justice even if you have to have it rung across the oceans of this land to their board rooms, wherever they may be.
>
> Chrysler must take notice that it is responsible, under the Constitution and laws of this state, and that we are ringing the bell of justice so that she can walk a little taller and stand a little prouder.

27

Thus, counsel's closing argument had a clear rhetorical aim of making defendant's German ownership a critical issue in the minds of the jurors. By associating plaintiff with those who had endured inhuman treatment in concentration camps, counsel likened defendant DaimlerChrysler—which, as the jury was informed, was partially under German ownership—with the Nazis. This argument was an attempt to incite the jury to heap upon the *defendant* the moral outrage that is now reserved for the Nazis and those who assisted them in carrying out the Holocaust. It was, in other words, a naked appeal to passion and prejudice and an attempt to divert the jury from the facts and the law relevant to this case.

Besides associating defendant with one of the most destructive and inhumane forces in modern history, counsel attempted artfully to convince the jury that defendant itself had *physically* harmed plaintiff, when there was no record of physical injury in the record. In describing plaintiff's refusal to quit her position as a millwright, counsel argued:

> She stayed. She was not going to give up. *You could kick her. You could torture her.* You could harass her. You could put her in hospitals, but she was going to claw. She was going to hold on. She was going to do whatever was necessary to not lose that last shred of humanity that made her pull—that constitutes the

soul, the thread, that will live on forever after she is gone [Emphasis added].

Plaintiff's counsel also equated plaintiff with a dog that had been kicked, beaten, and physically abused on a daily basis. Although counsel was quick to point out that he was not saying that plaintiff was *actually* a dog, he failed to mention that there was absolutely no evidence that plaintiff had been physically abused in any way by any employee of defendant.

Plaintiff's counsel also played on prejudice against corporations, arguing that DaimlerChrysler thought that it did not have to obey the law simply because of its corporate status:

> You [defendant] are not God Almighty sitting on the mountain. You are not Zeus . . .

> We will hold you to the same standard we will hold to anyone else, because their attitude speaks volume [sic] of their belief that they are above being held to the same standard as a lowly woman millwright would be held to.

Later, plaintiff's counsel argued:

> [A]pparently . . . when you enter the confines of a multi, a very, very successful business over on Jefferson, that the laws of civility don't apply.

> That they are . . . permitted under the laws and the Constitution of this state to be less civil and less respectful of civil rights. . . . They think, they must think that it is okay with you that this type of thing went on day after

29

> day. That it was okay to treat a woman the way Linda was treated.
>
> That it was okay with you that they tried to take away a woman's livelihood, the first and only female millwright ever employed at that plant. That it is okay to humiliate and degrade a woman as she tries to earn and do her best[.]

Equally telling is counsel's argument that "[plaintiff was] discriminated against twice, because she is not Lee Iacocca. She is just a millwright."

There was no evidence presented at trial suggesting that anyone employed by defendant thought incorporation relieved it of the obligation to follow the law. Nor was there evidence that anyone in the management of DaimlerChrysler approved of sexual harassment or would have responded differently had a corporate officer been the subject of sexual harassment.

These arguments were little more than pleas for the jury to consider defendant's corporate status rather than its true liability under the CRA. However justifiable counsel's moral indignation over the treatment plaintiff encountered while working for DaimlerChrysler, that indignation does not and cannot justify rhetoric that attempts to inflame passion and prejudice and that intentionally subverts the jury's fact-finding role.

Finally, plaintiff's counsel attempted to inject passion and prejudice into the adjudication of this matter by deliberately and repeatedly using language that calls for punitive rather than compensatory damages. A number of these pleas for punitive damages have already been cited. One request for punitive damages was particularly overt:

> You must consider the days, the minutes, the hours, and the weeks that she went through for seven years, and for as long as God gives her on this plant [sic], God help her, and allows her to maintain on this plant [sic], despite the disease that she is suffering from, the diseases that she will suffer from, and that will kill her, you must consider that, and so that your verdict reflect the enormity of the wrong, the intolerable nature of the injury, the extent of the humiliation, the torture, the extent of the outrage perpetrated upon, I can suggest, and you can go back in your jury room, and you determine whether this is right. That is should be more, that it should be less.
>
> But I suggest to you that you award as full and complete justice for the seven years of past and for the future, whatever it holds, $140,000,000.00. You can break that any way you want . . .
>
> [T]he hopes and dreams of all free Americans exist in Linda the way they do in all of us.
>
> And to destroy those, and to subject anyone to the type of indignity and injustice and intolerable acts that this woman has been subjected to for the past seven years, that figure reflects a symbol, if you will, since you can't adequately compensate her for every . . .

31

This soliloquy stopped briefly only when defense counsel objected to this use of punitive damages rhetoric and the court gave a curative instruction.

The verdict rendered by the jury, however, showed that the damage had been done—that counsel's inflammatory rhetoric had its intended effect. Instead of awarding plaintiff an amount that fully and fairly compensated her, the jury returned a verdict that responded to plaintiff's request that they "send a message" to Chrysler.

Counsel's persistent and deliberate efforts to incite passion and prejudice distinguish this case from those in which inflammatory remarks were fleeting and unintentional.[34] Plaintiff's counsel has been admonished in two published Court of Appeals opinions since this trial for precisely the same sort of hyperbolic and vitriolic argument he made on behalf of Linda Gilbert.[35]

---

[34] See, e.g., *People v Bahoda,* 448 Mich 261; 531 NW2d 659 (1994) (rejecting the defendant's claim of prosecutorial misconduct where references to the defendant's ethnicity were "innocuous, unintended, and not of a degree that prejudiced the defendant's right to a fair trial").

[35] In *Powell v St John Hospital,* 241 Mich App 64; 614 NW2d 666 (2000), the Court of Appeals "admonish[ed]" counsel for misconduct that included his efforts to "gratuitously insert[]" the issue of race into a medical malpractice claim, [his] repeated "belittle[ing]" of witnesses, his inappropriate assertion that the decedent had been
(continued…)

32

Overreaching, prejudice-baiting rhetoric appears to be a calculated, routine feature of counsel's trial strategy. This deliberate use of improper argument, coupled with the astonishingly excessive verdict rendered against defendant, precludes us from concluding that counsel's misconduct was "innocuous" and "unintended."

In fact, plaintiff's counsel's behavior during trial is remarkably similar to what necessitated a new trial in *Reetz v Kinsman Marine Transit Co.*[36] The plaintiff in *Reetz* was injured when he fell into an open hatch while working

---

(…continued)
"tortured," and his personal attacks against defense counsel.

Earlier, in *Badalamenti v Beaumont Hosp-Troy*, 237 Mich App 278, 281; 602 NW2d 854 (1999), the Court of Appeals held that counsel's misconduct was so pervasive that it would have provided a separate basis for a new trial. Again, in *Badalamenti,* that Court rebuked counsel for his personal attacks against the defendant and defense counsel, his repeated argument that the defendant was greedy and only cared about money, and that his appeal to the jurors' self-interest as taxpayers. The panel concluded:

> [Plaintiff's counsel] sought to divert the jurors' attention from the merits of the case and to enflame the passion of the jury. That strategy paid off handsomely here in the form of a large verdict for plaintiff. The cumulative effect of the improper innuendo, remarks, and arguments by plaintiff's lead trial counsel was so harmful and so highly prejudicial that we are unable to conclude that the verdict in this case was not affected. [*Id.* at 292.]

[36] 416 Mich 97; 330 NW2d 638 (1982).

as a deckhand.  The vessel on which plaintiff sustained his injuries was owned by Kinsman Marine Transit Company, and George Steinbrenner, III, served as chairman of the board for Kinsman's parent company.  Reetz's counsel made Kinsman's corporate status an issue at trial, arguing that Kinsman "cared nothing about Reetz's welfare . . . ."[37] Further, Reetz's counsel made "repeated references" to Mr. Steinbrenner, despite the fact that Mr. Steinbrenner had no personal involvement in the case.[38]  We concluded in *Reetz* that

> [t]he effect of these comments was to create in the minds of the jurors an image of Kinsman as an unfeeling, powerful corporation controlled by a ruthless millionaire.  Even a juror who harbored no prejudice against corporations or millionaires might have been swayed by these inflammatory remarks to alter his view of the evidence.[39]

On the basis of counsel's *ad hominem* attacks against the defendant and his numerous references to mutlimillion dollar verdicts in other cases, we concluded that the jury had been incurably tainted and a new trial was necessary.[40]

---

[37] *Id.* at 110.

[38] Id.

[39] *Id.* at 111.

[40] *Id.* at 107, 112.

The parallel to arguments made by plaintiff's counsel in this case is striking. Here, however, the anticorporate rhetoric was even less subtle than that supporting a new trial in *Reetz*.[41] And instead of referring to other multimillion dollar verdicts, counsel repeatedly utilized language calling for punitive damages.[42] Therefore, we conclude that

> "[t]he record in the instant case shows a deliberate course of conduct on the part of counsel for plaintiff aimed at preventing defendant from having a fair and impartial trial. We think the course of misconduct was so persistently followed that a charge of the Court in an effort to obviate the prejudice would have been useless."[43]

When faced with defendant's motion for postjudgment relief under MCR 2.611, the trial court had no reason to deny relief and every reason to grant it. In making its ruling on defendant's posttrial motions, the trial court clearly ignored the prominence of prejudicial rhetoric in plaintiff's closing argument and the effect that this rhetoric had on the jury.

---

[41] See, e.g., p 29 ("[A]pparently . . . when you enter the confines of a multi, a very, very successful business over on Jefferson, . . . the laws of civility don't apply.").

[42] See p 27.

[43] *Id.* at 111-112, quoting *Steudle v Yellow & Checker Cab & Transfer Co,* 287 Mich 1, 11-12; 282 NW2d 879 (1938).

35

The trial court's failure to grant a new trial was, therefore, an abuse of discretion. We reverse the judgment of the Court of Appeals and remand this action to the circuit court for proceedings in accordance with this opinion.

C.  MRE 702 & THE EXPERT OPINION TESTIMONY OF STEVEN HNAT

In order to provide guidance for the new trial, we address the controversy surrounding the expert testimony and the erroneous standard propounded by the Court of Appeals concerning the gate keeping role required by MRE 702. We now clarify that MRE 702 requires the trial court to ensure that each aspect of an expert witness's proffered testimony—including the data underlying the expert's theories and the methodology by which the expert draws conclusions from that data—is reliable.

1.  THE COURT'S GATEKEEPER ROLE UNDER MRE 702

MRE 702, as it existed at the time of trial,[44] provided:

---

[44] MRE 702 was amended effective January 1, 2004, to particularize the kind of gatekeeper inquiry the trial court is required to make. MRE 702 now states:

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the
(continued…)

> If the trial court determines that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In both its former and current incarnations,[45] MRE 702 has imposed an obligation on the trial court to ensure that any expert testimony admitted at trial is reliable.[46] While the

---

(…continued)

> evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

[45] See n 18 and accompanying text.

[46] See MRE 702 (providing that expert testimony is admissible "[i]f the court determines" that certain preconditions are met). See also *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579, 589; 113 S Ct 2786, 125 L Ed 2d 469 (1993) (concluding from similar language in Federal Rule of Evidence 702 that "the trial judge *must ensure* that any and all scientific testimony or evidence admitted is not only relevant, but reliable" [emphasis added]).

In fact, the trial court's obligation under MRE 702 is even stronger than that contemplated by FRE 702 because Michigan's rule specifically provides that the court's determination is a precondition to admissibility. Compare FRE 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue . . .") with the

(continued…)

exercise of this gatekeeper role is within a court's discretion, a trial judge may neither "abandon" this obligation nor "perform the function inadequately."[47]

Indeed, the obligation imposed by MRE 702 is reinforced by MRE 104(a), which provides that "[p]reliminary questions concerning the qualification of a person to be a witness . . . *shall* be determined by the court . . . ."[48] The requirements of MRE 104(a) extended to the application of MRE 702 because the admission of expert testimony under this rule hinges on preliminary questions concerning qualification. For example, reference in MRE 702 to "scientific" evidence "implies a grounding in the methods and procedures of science," and the rule's reference to "knowledge" "connotes more than subjective belief or unsupported speculation."[49] As such, MRE 104

_____

(…continued)
older MRE 702 ("If *the court determines* that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." [Emphasis added.]).

[47] *Kumho Tire Co Ltd v Carmichael,* 526 US 137, 158-159; 119 S Ct 1167; 143 L Ed 2d 238 (1999) (Scalia, J., concurring).

[48] MRE 104(a) (emphasis added).

[49] Daubert, supra at 590.

requires the trial court to address these preconditions before admitting expert testimony.

It is well-established that the proponent of evidence "bears the burden of establishing relevance and admissibility."[50] At the time this case was tried, the proponent of expert opinion evidence bore the burden of establishing admissibility according to the *Davis-Frye* "general acceptance" standard.[51] MRE 702 has since been amended explicitly to incorporate *Daubert's* standards of reliability. But this modification of MRE 702 changes only the factors that a court may consider in determining whether expert opinion evidence is admissible. It has not altered the court's fundamental duty of ensuring that *all* expert opinion testimony—regardless of whether the testimony is based on "novel"[52] science—is reliable.

---

[50] *People v Crawford*, 458 Mich 376, 388 n 6; 582 NW2d 785 (1998) (describing this rule as "basic hornbook law").

[51] See *People v Davis*, 343 Mich 348; 72 NW2d 269 (1995); *Frye v United States*, 54 App DC 46; 293 F 1013 (1923).

[52] See, e.g., *People v Young,* 418 Mich 1, 24; 340 NW2d 805 (1983). Because the court's gatekeeper role is mandated by MRE 702, rather than *Davis-Frye*, the question whether *Davis-Frye* is applicable to evidence that is not "novel" has no bearing on whether the court's gatekeeper responsibilities extend to such evidence. These responsibilities are mandated by MRE 702 irrespective of whether proffered evidence is "novel." See MRE 702; see
(continued…)

Thus, properly understood, the court's gatekeeper role is the same under *Davis-Frye* and *Daubert*.[53] Regardless of which test the court applies, the court may admit evidence only once it ensures, pursuant to MRE 702, that expert testimony meets that rule's standard of reliability. In other words, both tests require courts to exclude junk science; *Daubert* simply allows courts to consider more than just "general acceptance" in determining whether expert testimony must be excluded.

This gatekeeper role applies to *all stages* of expert analysis. MRE 702 mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data. Thus, it is insufficient for the proponent of expert opinion merely to show that the opinion rests on data viewed as legitimate in the context of a particular area of expertise (such as medicine). The proponent must

---

(…continued)

also *General Electric Co v Joiner*, 522 US 136, 142; 118 S Ct 512; 139 L Ed 2d 508 (1997) (noting that FRE 702 overruled *Frye* but left intact the court's gatekeeper responsibilities).

[53] See *Joiner, supra* at 142 ("[W]hile the Federal Rules of Evidence allow district courts to admit a somewhat broader range of scientific testimony than would have been admissible under *Frye, they leave in place the 'gatekeeper' role of the trial judge in screening such evidence."* [Emphasis added.]).

also show that any opinion based on those data expresses conclusions reached through reliable principles and methodology.[54]

Careful vetting of all aspects of expert testimony is especially important when an expert provides testimony about causation.[55] The United States Supreme Court's caveat in *Joiner* is persuasive:

> [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.[56]

When a court focuses its MRE 702 inquiry on the data underlying expert opinion and neglects to evaluate the extent to which an expert extrapolates from those data in a manner consistent with *Davis-Frye* (or now *Daubert*), it runs the risk of overlooking a yawning "analytical gap" between

---

[54] See, e.g., *Porter v Whitehall Labs, Inc*, 9 F3d 607, 615-617 (CA 7, 1993) (holding that the district court properly excluded expert testimony in which the expert's theory that plaintiff's injuries were caused by ingestion of ibuprofen failed under *Daubert*).

[55] See, e.g., *Diaz v Johnson Matthey, Inc,* 893 F Supp 358, 377 (D NJ, 1995) (concluding that an expert's "testimony on specific causation [was] not sufficiently reliable to be admissible under Rule 702").

[56] Joiner, supra at 146.

that data and the opinion expressed by an expert.[57]  As a result, ostensibly legitimate data may serve as a Trojan horse that facilitates the surreptitious advance of junk science and spurious, unreliable opinions.

### 2.  MR. HNAT'S MEDICAL OPINION TESTIMONY

Both the trial court and the Court of Appeals seem unaware of the core gatekeeper principles described above. As a result, the faux "medical" opinion of an individual who lacked any medical education, experience, training, skill, or knowledge became the linchpin of plaintiff's case and unmistakably affected the verdict.

Plaintiff's theory at trial was that the sexual harassment she encountered as defendant's employee had produced a permanent change in her "brain chemistry," that this neurological change led to an increase in substance abuse and that, in the end, defendant's failure to curb sexual harassment in plaintiff's workplace would cause her to die the most painful death imaginable because of the metabolic physiological phenomena he described.[58]  The

---

[57] *Id.*

[58] Mr. Hnat told the jury that "[p]ancreatitis is the worse [sic] pain a person could experience.  The pancreas as you know is very innervated [sic] and when you develop pancreatitis that is the most painful way to die."

theory was presented through the testimony of Mr. Hnat, a social worker, and was based on his analysis of medical records from various hospitals and clinics where plaintiff was treated for substance abuse.

Mr. Hnat testified that he was a certified social worker with experience in substance abuse treatment.[59] He also testified that he had received a master's degree in psychobiology, although it was revealed after trial that this testimony was patently false.[60]

---

[59] A social worker is certified in Michigan under MCL 333.18511. "Social work," as used in this section, is defined as

the professional application of social work values, principles, and techniques to counseling or to helping an individual, family, group, or community do 1 or more of the following:

(i) Enhance or restore the capacity for social functioning [or]

(ii) Provide, obtain, or improve tangible social and health services. [MCL 333.18501(d)].

[60] Mr. Hnat was allowed to testify based in part on his assertions—both in court and in a written resume submitted as an exhibit—that he had a master's degree in psychobiology from the University of Michigan and that he had received the prestigious Pillsbury Prize in psychology as an undergraduate. Defendant discovered after trial that both statements were false. Contrary to his sworn testimony, plaintiff had neither obtained a master's degree in psychobiology nor received the Pillsbury Prize as an undergraduate.

(continued…)

43

Apparently influenced by Mr. Hnat's claim to have expertise in psychobiology, the trial court permitted plaintiff to introduce medical records through Mr. Hnat's testimony. Before the admission of records from Sacred Heart Rehabilitation Center, defense counsel raised the following objection:

> Your Honor, I object to their admission. Certainly, with regard to this witness, he is not a medical doctor to review all of these other records and testify about them. He is a social worker and he is competent to testify about his own records.
>
> It is just not appropriate. The foundation hasn't been laid for the introduction of those records, certainly not pursuant to this individual.

---

(…continued)

We disagree with the Court of Appeals' suggestion that the trial court could have legitimately concluded that Mr. Hnat "had simply misspoken" when he said that he had a Master's degree in psychobiology and had won the Pillsbury Prize. Slip op p 30. We doubt that anyone could honestly *misspeak* about having a degree that he did not, in fact, possess, much less that he could "misspeak" in a written resume. We also disagree with the lower courts' conclusion that there is no real difference between completing coursework necessary for a degree and actually *receiving* a degree. Unless and until an educational institution confers a degree, which is the institution's official determination that a student has met all the requirements, an expert witness may not, consistent with the oath, affirmatively represent to having "received" the degree.

This discrepancy in Mr. Hnat's qualifications could not have been inadvertent and ought to have given the JNOV motion. In addition, the falsification of Mr. Hnat's credentials supports our concern that the trial of this case was rife with unseemly tactics by plaintiff's counsel.

44

The trial court rejected defendant's argument that Mr. Hnat was unqualified to articulate an opinion based on records compiled when plaintiff sought treatment for substance abuse. However, the record in this case reveals that, irrespective of whether the medical records detailing plaintiff's substance abuse treatment were admissible, Mr. Hnat was asked to interpret those records and thereby render an opinion that he was wholly unqualified to give.

For example, the following exchange took place during plaintiff's direct examination of Mr. Hnat:

> *Q.* Will [plaintiff] be able to work in light of what you know about her condition as recently as yesterday? Will she continue to be physically able to work?
>
> *A.* No. *Her medical complications at this point have progressed to the point where she is going to be physically unable to work fairly soon.*
>
> She is going to have increasing hospitalizations most likely to deal with the cirrhosis, the pancreatitis, she may need transplants at some point, she may need any range of radical medical intervention. So her ability to work physically is severely impaired at this point even though right now she is functioning okay. There is going to be increasing problems associated with this medical condition. It's unavoidable. People have those severe complications must work [sic].
>
> *Q.* Do you have any idea what was the cause of her problems as they exist in this lady as late as yesterday?

45

*A.* Alcoholism, major depression precipitated by work stresses, and sexual harassment. That is the bottom line.

*Q.* What do you mean that is the bottom line?

*A.* I mean that is what happened here, *that is what is killing this person, probably has killed her as far as you can tell at this point. I wouldn't bet on her living very long.* She might, if she gets treatment. There's a chance. If she doesn't get treatment, she'll die fairly soon. [Emphasis added.]

The impact of Mr. Hnat's "medical opinion" on the verdict rendered in this case could not have been more pronounced. Especially noteworthy is the fact that, during closing arguments, plaintiff's counsel encouraged the jury to treat Mr. Hnat's opinion as an actual medical prognosis:

You heard testimony, and I don't think Mr. Hnat was being glib when he testified about the fact that although he is not an omniscient, he is not a sooth sayer, he has read her death certificate.

Her death certificate, her death will come sooner or later, none of us can know for sure. You will consider this in a haze of alcohol. She will die either in a violent event if she drives, or she will die of the effects of alcohol on her body. She will have chronic hepatitis, in other words, a disease of the liver, cirrhosis, if you will. She will have dehydration as Mr. Hnat testified to. She will have metabolic acidosis that will slowly put her into a coma.

She will have increased red blood cells, or low blood cells to fight infection. She will have chronic pancreatitis. One of the most painful diseases known to medical science, inflammation of her pancreas. And she has

46

suffered all of these during hospitalizations, as Mr. Hnat has testified to.

She will suffer severe abdominal pain, and she will die. And she will not live out her life.

At one point during closing arguments, plaintiff's counsel even told the jury that plaintiff had to leave the courtroom for a portion of his closing argument because the "prognosis that she has for her life" was too grim for her to hear.[61]

As these excerpts reveal, Mr. Hnat unquestionably used the content of plaintiff's treatment records to render an opinion that required *medical* expertise. He speculated about plaintiff's impending physical inability to work, testified about the type of medical complications that plaintiff would soon experience, predicted the cause of her death, and gave testimony concerning plaintiff's life expectancy. Mr. Hnat expressed his "opinion" on physiological disease, cause of death, and plaintiff's lifespan. Yet there was no evidence or showing that Mr.

_____

[61] After plaintiff left the courtroom (apparently at counsel's request), counsel told the jury, "While it is necessary for me to review evidence, I don't believe that it is necessary for me to review statements made by doctors in front of Linda Gilbert with regard to the prognosis that she has for her life, because I don't believe that it is my job here to rob her of whatever hope that she may have for the future."

47

Hnat was qualified by training, experience, or knowledge to render such opinions or interpret medical records that would arguably support such a diagnosis or prognosis. There was, in other words, no evidence that Mr. Hnat was qualified to testify that defendant's actions concerning workplace harassment *caused* neurological and physiological changes in plaintiff and shortened her life.

Plaintiff's arguments in support of Mr. Hnat's testimony and the Court of Appeals' acceptance of those arguments can be based only on a misinterpretation of MRE 702. Plaintiff argued, for example, that Mr. Hnat was qualified to interpret plaintiff's medical records because he is a "treater." In order for Mr. Hnat to provide an admissible opinion interpreting medical records for purposes other than those related to the expertise of social workers, plaintiff bore the burden of showing that Mr. Hnat was qualified by knowledge, skill, experience, training, or education in *medicine*. Given the absence of such evidence, plaintiff failed to carry the burden of establishing the admissibility of Mr. Hnat's medical opinions, regardless of the admissibility of the records that ostensibly informed this opinion.

Likewise, we reject the Court of Appeals' argument that "the 'mere fact' that Mr. Hnat 'is not a medical

48

practitioner does not render him unqualified as an expert witness'" because "[a]ny limitations in" Mr. Hnat's "qualifications are relevant to the weight, not the admissibility, of his testimony."[62]  The Court of Appeals' observation that one need not be a medical practitioner to testify as an expert is little more than a truism.  And we do not disagree with the proposition that, in some circumstances, an expert's qualifications pertain to weight rather than to the admissibility of the expert's opinion.[63]  That is not to say, however, that *any* issue of qualification relates to weight rather than admissibility.

As shown, MRE 702 establishes preconditions for the admission of expert opinion.  Such testimony must be rooted

---

[62] Slip op at 33-34, quoting *Grow,* 236 Mich App 713-714.

[63] In *Grow*, for example, the Court of Appeals held that the testimony of a certified social worker with fourteen years of experience in counseling "victims of sexual, physical, and emotional abuse" was admissible on the issue of plaintiff's posttraumatic stress disorder.  *Id.* at 713.  Because the social worker in *Grow* had actual experience in counseling persons suffering from posttraumatic stress disorder, his testimony was admissible under MRE 702, which refers to a witness "qualified as an expert by knowledge, skill, *experience*, training, or education . . . ." (Emphasis added.)  If the defendant in *Grow* had offered the expert opinion of a *psychiatrist* with experience in treating posttraumatic stress disorder, the more limited qualifications of plaintiff's certified social worker would have been relevant to the weight of his testimony even though they would not have barred its admission.

49

in "recognized *scientific*, technical, or other specialized *knowledge*" and must assist the trier of fact. The burden is on the party *offering* the expert to satisfy the preconditions established by MRE 702.[64]

Where the subject of the proffered testimony is far beyond the scope of an individual's expertise—for example, where a party offers an expert in economics to testify about biochemistry—that testimony is *inadmissible* under MRE 702. In such cases, it would be inaccurate to say that the expert's lack of expertise or experience merely relates to the weight of her testimony. An expert who lacks "knowledge" in the field at issue cannot "assist the trier of fact."

Here, according to plaintiff's counsel, Mr. Hnat gave plaintiff a "prognosis" on the basis of his interpretation of records from medical and treatment facilities. The medical "prognosis" of a social worker who has no training in medicine and lacks any demonstrated ability to interpret medical records meaningfully is of little assistance to the trier of fact.

We also reject the Court of Appeals' assertion that Mr. Hnat's medical testimony on the physiological effects

---

[64] Crawford, supra at 388 n 6.

50

of alcoholism and depression was admissible because these effects are "common knowledge."[65] As the United States District Court for the Eastern District of Michigan has aptly stated:

> [E]xpert testimony is not admissible unless it will be helpful to the fact finder. Such testimony is unhelpful when it is unreliable or irrelevant, as the [Supreme] Court observed in *Daubert*, . . . *and also when it merely deals with a proposition that is not beyond the ken of common knowledge.*[66]

To justify the admission of an expert opinion on the basis of the belief that *no expertise is necessary* to render such an opinion is to fail to give any effect to MRE 702, and, indeed, to turn that rule on its head. The previous MRE 702 allowed expert opinion testimony only "[i]f the trial court determines that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. . . ." Thus, the Court of Appeals panel's rationalization that Mr. Hnat's expert opinion testimony was harmlessly admitted because it was based on "common knowledge" is inconsistent with the requirements of MRE 702.

---

[65] See slip op at 34.

[66] *Zuzula v Abb Power T & D Co, Inc,* 267 F Supp 2d 703, 711 (ED Mich, 2003) (emphasis added).

51

Unless information requiring expert interpretation actually goes through the crucible of analysis by a qualified expert, it is of little assistance to the jury and therefore inadmissible under MRE 702. We direct the trial judge on retrial to ensure that expert opinion testimony meets the purpose expressed in MRE 702—that of assisting the trier of fact through the introduction of reliable "scientific, technical, or other specialized knowledge."

D. THE SUFFICIENCY OF PLAINTIFF'S CLAIM UNDER THE CRA

We turn finally to defendant's claim that the trial court erred by admitting evidence regarding incidents of sexual harassment of which defendant was never properly notified. Defendant moved in limine to exclude incidents that plaintiff reported for the first time at her deposition. The court denied that motion, concluding that the jury could consider each incident in order to determine whether defendant had actual or constructive notice that plaintiff was subjected to a hostile environment. The Court of Appeals employed a similar logic in concluding that each incident was admissible.

While the trial court did not err in denying defendant's motion to exclude those incidents,[67] this ruling has resulted in substantial confusion.  We now clarify the legal justification for the trial court's decision in order to minimize confusion during retrial.

Under the Civil Rights Act, an employer may be liable for an employee's sexual harassment when the employer has notice of the harassment and fails to take appropriate corrective action.[68]  In *Chambers,* we held that "notice of sexual harassment is adequate if, by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring."[69]

---

[67] We do not mean to say, however, that every incident described at trial was admissible to support a claim of sexual harassment.  In *Haynie v Michigan,* 468 Mich 302; 664 NW2d 129 (2003), we stressed that sexual harassment is defined by statute as "unwelcome *sexual* advances, requests for *sexual* favors, and other verbal or physical conduct or communication of a *sexual* nature . . . ."  *Id.* at 309, quoting MCL 37.2103(i) (emphasis added).  Some of the incidents described during this trial were not sexual in nature and therefore were improperly admitted to support plaintiff's theory of sexual harassment.  *Haynie* shall control the admission of evidence at the retrial.

[68] *Chambers v Trettco, Inc,* 463 Mich 297, 312; 614 NW2d 910 (2000).

[69] *Id.* at 319.

53

When a plaintiff describes an incident of sexual harassment for the first time at her deposition, evidence pertaining to that incident may be admissible under two rationales. First, such evidence may be admissible in order to establish the nature and extent of the hostile environment to which plaintiff was subjected and the adequacy of defendant's response upon being notified about sexual harassment. Second, that evidence may be admissible under a "constructive notice" theory when a plaintiff contends that sexual harassment was so pervasive that her employer *should* have known of the need for corrective measures.[70]

In this case, plaintiff gave actual notice to defendant through defendant's formal reporting procedures before initiating this lawsuit. Any incidents that she described for the first time at her deposition were admissible in order to establish an element of her hostile environment claim—that "the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created *an intimidating, hostile, or offensive work environment,*"[71]—and to establish

---

[70] See *id.*

[71] *Id* at 311 (emphasis added).

54

the inadequacy of defendant's response to that hostile environment. Therefore, the circuit court did not err by denying defendant's motion to exclude evidence of any incident that plaintiff described for the first time at her deposition.

### III. CONCLUSION

For the foregoing reasons, we conclude that the trial court abused its discretion in denying defendant's motion for a new trial under MCR 2.611. Once the jury issued its verdict, it should have been apparent to the trial court that the persistent and calculated efforts of plaintiff's trial counsel to thwart the jury's fact-finding role had borne fruit. The jury's deliberations had been palpably affected and this wrought substantial harm to defendant's right to a fair trial. This case is remanded to the Wayne Circuit Court for a new trial to be held consistently with this opinion.

Robert P. Young, Jr.
Maura D. Corrigan
Clifford W. Taylor
Stephen J. Markman

55

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

LINDA M. GILBERT,

    Plaintiff-Appellee,

v                            No. 122457

DAIMLERCHRYSLER CORPORATION,

    Defendant-Appellant.

_____

CAVANAGH, J. (*dissenting*).

This case is about male employees sexually harassing a female employee and an employer that did very little to try to make it stop. This case is *not* about plaintiff's counsel's "routine" behavior, contrary to the assertions of the majority. *Ante* at 33. Whatever plaintiff's counsel may have done in past cases is irrelevant to *this particular case*. In this case, an objective review of the evidence indicates that plaintiff overwhelmingly provided facts to prove that she was sexually harassed and that defendant conducted an inadequate investigation into this harassment. Defendant's inadequacies in the work place continued in the courtroom as it selected a trial strategy intended to "blame the victim" for the harassment that

occurred. Defendant's repeated errors in judgment should not now be redressed by this Court.

The majority remands this matter for a new trial because it asserts that the trial court abused its discretion in denying defendant's motion for a new trial. The majority claims that "it should have been apparent to the trial court that the persistent and calculated efforts of plaintiff's trial counsel to thwart the jury's fact-finding role had borne fruit." *Ante* at 54. I disagree and believe there was substantial admissible evidence for the jury to hold defendant liable. Therefore, I respectfully dissent.

## I. EVIDENCE OF HARASSMENT AND THE CONDUCT OF PLAINTIFF'S COUNSEL

The majority states that "the jury's verdict unmistakably reflects passion rather than reason and prejudice rather than impartiality." *Ante* at 4. I disagree. The standard for reviewing defendant's motion for a new trial, MCR 2.611, is the abuse of discretion standard. *Brown v Arnold*, 303 Mich 616, 627; 6 NW2d 914 (1942). An abuse of discretion occurs "only when the result is so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but

2

defiance thereof, not the exercise of reason but rather of passion or bias." *Alken-Ziegler, Inc v Waterbury Headers Corp*, 461 Mich 219, 227; 600 NW2d 638 (1999) (citations and internal quotation marks omitted). While the majority clearly disagrees with the verdict, there was ample testimony from numerous witnesses to support the jury's verdict that plaintiff, the first and only female millwright for a lengthy period at defendant's plant, was the victim of sexual harassment and that defendant did not engage in an adequate investigation or remedial action to stop this harassment.

An employee in defendant's human resources department testified that the investigation into plaintiff's sexual harassment claims was inadequate.[1] Another employee in defendant's human resources department testified that

---

[1]

> *Q.* But we all know that you didn't do any investigation?
>
> *A.* Not adequately. Yes. As has been brought out here.
>
> * * *
>
> *Q.* After the Polaroid penis, you did nothing, am I correct, you did nothing, you decided you did everything you could do and you decided not to take any further action, correct.
>
> *A.* That's what we decided.

3

without being given a name he would not even know where to begin a sexual harassment investigation. Yet another employee in the human resources department testified that she told plaintiff she would provide her with the name and number of a union representative who might be helpful, but the name and number were never provided to plaintiff because the employee never saw plaintiff again.[2] Defendant's corporate representative at trial, who was also one of plaintiff's supervisors, conveyed to the jury that defendant's investigation essentially consisted of passing out defendant's sexual harassment policy and asking the men if they harassed plaintiff or knew who did.[3] The trial

---

[2]

    *Q.* And you actually never did give Linda [plaintiff] that number because you didn't see her again am I correct?

    *A.* That is correct.

[3]

    *Q.* And if somebody didn't come forward to you, apparently, and tell you that they saw so and so do it, that was it?

    *A.* Working with the frame of the union, the local agreements, that's it.

        * * *

    *Q.* And you're claiming—by the way, with regard to this [the March 1995 incident, which
                         (continued…)

4

representative said he approached some of the men as a *group* and asked if they knew who was sexually harassing plaintiff. He also said he hoped someone else would do the investigating and that he did not feel it was his responsibility to investigate.[4]  The trial representative

<hr>

(…continued)
> was the poem "The Creation of a Pussy"] that's the only thing that you know of that–or the only claim quote unquote investigation that you did was ask the men whether they knew who did it; is that what you claim?
>
> *A.* Yes, sir.
>
> *Q.* Okay.  Now you didn't do it in a systematic fashion, did you?
>
> *A.* As far as questioning the men?
>
> *Q.* Right.
>
> *A.* No, I did not.
>
> *Q.* You just as you could run into them?
>
> *A.* As I approached them, yes.

[4] Regarding later incidents, the trial representative testified:

> *Q.* Since you felt that you expected Chrysler [defendant] would assign the lawyers or somebody else to investigate Linda's [plaintiff's] sworn statement regarding the continued and unabated acts of harassment between 1992 and November 4 of 199—on November 3, 1994 when her statement was taken, did you ever see anybody from Chrysler assigned to investigate these claims—not you but somebody else, as a result of the statement?
>
> *A.* No, I did not.

(continued…)

later testified that asking the men if they knew who was responsible for the incidents was inadequate. He further stated that he did not know of any other investigation that was done.

An employee who worked for defendant for thirty-one years testified that he had never seen anyone treated like plaintiff. He stated, "She was relentlessly pounded with derogatory statements, with no help when she was given a job, and there were several people involved on the same job. She would not get a lot of cooperation. She was just basically resented that she was a woman, making a man's wage." The employee also testified that plaintiff was subjected to physical danger by not getting the cooperation she needed, and that other millwrights received, when doing her work. Although millwrights commonly work in pairs, she was often forced to work alone. He testified that this abusive conduct occurred nearly every day, was devastating to plaintiff, and was readily apparent to plaintiff's supervisors. He also testified that supervisors made

(...continued)
> *Q.* So when you said you would have expected the lawyers to do it, even though you expected it apparently nobody at Daimler Chrysler did it, am I correct?
>
> *A.* Not that I'm aware of.

6

offensive comments as well.  This employee drove plaintiff home from work for a period and testified she cried at least one hundred times on the way home from work.  "She never knew what to expect on any given day that she went into work . . . ."  He also testified that the stench of urine from a chair in an area set off for plaintiff made it evident that someone had urinated on it.  Further, the employee stated that he did not observe any of defendant's employees try to stop the harassment.

Plaintiff testified that when she went to work each day she "never knew what to expect."  She said abusive comments were essentially an everyday occurrence, and she said she was isolated and ostracized at work.  Plaintiff stated that the conduct made her afraid and angry and that she had problems sleeping.  She also experienced headaches, stomach problems, and problems associated with her asthma.  Plaintiff said she felt hopeless and attempted suicide because she could not get any cooperation or help from defendant.[5]  Regarding her suicide attempt, plaintiff said

---

[5] Plaintiff testified:

And I tried to do something about it, and nothing got done about it.  People saw what was happening.  Nobody would do anything.  Nobody would help me.

(continued…)

"that's what I did and I regret it, but I just felt pushed to that point where I couldn't take it anymore."  Plaintiff said she felt torn up inside and that the harassment was an assault to her person.  Plaintiff said she began drinking "to escape" and help dull her feelings.  Plaintiff testified that the abusive comments were still being made at the time of the trial, but she was not going to quit over the harassment; she refused to be driven out of her job.

I believe even this limited testimony indicates that there was ample evidence to support the jury's verdict, and

_____

(…continued)

* * *

I turned things in.  There was a, in my opinion, there was a slight attempt at, perfunctory attempt at making a report.  After those things were turned in, the guys laughed about it.  They thought it was a big joke.  The first thing that got turned in.  It was a week and a half later that the second thing, picture of the penis was on my tool box.

So, that showed how serious they took everything.

Plaintiff also testified that when she reported that "BITCH" was written on masking tape and fastened to her toolbox, she was told by a supervisor not to show that it bothered her and the harassment may stop.  Plaintiff was also told that changing her clothes in a certain location, which was enclosed, was "drawing attention to" herself.

8

I disagree that the verdict was the result of plaintiff's counsel's inflaming the jury with "hyperbolic rhetoric, prejudice-baiting argument, and unscientific expert testimony." *Ante* at 24. Plaintiff's counsel vigorously pursued this case; however, defense counsel's approach was no less vigorous.

Although defense counsel's strategy ultimately proved to be ineffective, and although the majority certainly disagrees with the verdict, it does not necessarily mean that plaintiff's counsel behaved inappropriately. A thorough review of defense counsel's conduct during trial illustrates that defense counsel's strategy was inadequate and, at times, disingenuous.

For example, defense counsel tried to characterize some of the men alleged to have engaged in the harassment as "ornery" and she referred to one as "basically a good guy." She tried to characterize their comments as "shop talk"[6] or "a slip of the tongue," and their conduct as

---

[6] Plaintiff testified she "was called a fucking cunt, whore, bitch, drunk ass, pussy."

Defense counsel then asked witnesses if words like bitch or cunt were appropriate as "shop talk."

"horseplay."[7]   She repeatedly questioned plaintiff about whether she reported harassing incidents to supervisors while plaintiff continually testified that the supervisors were standing right next to her during the incidents.[8]  When plaintiff testified that a coworker was snidely telling other employees to watch what they were saying or it would be labeled sexual harassment, defense counsel tried to characterize the coworker as being helpful by merely

---

[7] Contrary to defense counsel's characterization, an employee in defendant's human resources department stated that a reasonable person would find the cartoons and pictures offensive.  Another said he considered the penis photograph to be sexual harassment.

[8]

> *A.* [The supervisors h]ad been standing in the group of people with him speaking that way, yes.
>
> *Q.* And did you at any time ask either of them why they are permitting this individual to address you in such fashion?
>
> *A.* No, I didn't.
>
> *Q.* Then, how can you be certain they heard what you heard?
>
> *A.* Because they were right there.
>
> *Q.* What do you mean by right there, shoulder-to-shoulder with you?
>
> *A.* We were all in a group.  I mean, they weren't far enough away where they were out of earshot.

10

instructing other people about what is appropriate. Regarding an article about men and sperm left near plaintiff's soda can, defense counsel attempted to minimize the incident because the article was in a scientific magazine.

Defense counsel questioned plaintiff about plaintiff's alleged failures to keep abreast of defendant's investigations. Defense counsel also repeatedly alluded to the fact that plaintiff knew who was harassing her, even though plaintiff repeatedly said she did not know for certain and she did not want to falsely accuse someone. Defense counsel argued, "She [plaintiff] thought it was more important to protect whoever it was that was responsible."[9] Regarding plaintiff, defense counsel argued, "There is absolutely nothing wrong with her." Consistent with the strategy that plaintiff was responsible for the continued mistreatment, defense counsel asked witnesses if plaintiff was a "tomboy" and she also questioned whether plaintiff had "put herself in a position of being in a profession that has historically been dominated by me[n]."

_____

[9] Defendant's records, however, indicate that plaintiff did not know who was responsible for leaving harassing items. For example, defendant's records on October 10, 1994 state, "She [plaintiff] also stated she know [sic] it is a maintenance employee and she can only guest [sic] at this time because she hasn't seen them doing this."

During closing argument, defense counsel brought up private incidents relating to plaintiff that occurred over twenty years ago, even though plaintiff did not begin working with defendant until 1992. She argued the only problem plaintiff's coworkers had with plaintiff related to her alcoholism. "They never had a problem with Ms. Gilbert as a female." Defense counsel's theme was to blame the victim. This was demonstrated in a statement she made indicating that plaintiff's "medical records also reflect that she has a tendency to blame everyone else for her problems, rather than look directly at her problems."

The majority criticizes the conduct of plaintiff's counsel; however, a thorough review of the trial transcripts and lengthy closing argument finds sparse objections made by defense counsel and no impropriety justifying a new trial. Regarding statements made by plaintiff's counsel during closing argument, he first stated that plaintiff thanked the jury for allowing her to exercise her right as an American citizen to have her day in court. Plaintiff's theme during closing argument was that plaintiff had great fortitude to withstand the harassment. Plaintiff had repeatedly testified that she was not a quitter, she had every right to work at the plant, and she was not going to let them run her out.

Plaintiff's counsel referenced the strength of those who were affected by the Holocaust. He also referenced Prometheus and Zeus, and stated that the myth of the eagle pecking at Prometheus's liver for all eternity reminded him of plaintiff's ordeal. He compared plaintiff to Rosa Parks and Arthur Ashe, as well as a dog that was kicked and abused every day. He even referred to plaintiff as a pioneer. When reviewing the closing argument in context, it is obvious that plaintiff's counsel was arguing that plaintiff was courageous and determined. Contrary to the majority's assertion, plaintiff's counsel was no more likening plaintiff to the Holocaust victims than he was likening her to a figure in Greek mythology being pecked by a bird.

Plaintiff's counsel also *appropriately* stated that defendant should be judged just as any *individual* would be judged. And he stated that the jury could not punish defendant; it could only compensate plaintiff for the harm suffered. While plaintiff's counsel did refer to "torture" and "beating plaintiff down," the jury heard weeks of testimony and was aware that no evidence of physical abuse was introduced. Defense counsel obviously did not think the phrases were inflammatory because there was no objection raised. To suggest, as the majority does, that

the jury was somehow influenced or confused by these random phrases during closing arguments is insulting to the jurors' intelligence.

The majority's blanket statements about plaintiff's counsel belie the truth of the record. Plaintiff's counsel no more played on the prejudices of the jury because defendant was a German company than he played on the prejudices of the jury because he hoped the jury liked dogs, tennis players, or well-known pioneers such as Lewis and Clark. While plaintiff's counsel's comments are highlighted by the majority, the references were miniscule in the context of the entire trial. The majority hopes that by merely stating that these references were "naked appeals to entice the jury to consider its passions and prejudice," *ante* at 3, it can magically transform the events that occurred at trial. However, a review of the whole record reveals that the majority's approach misstates the events at trial.

The majority states, "Overreaching, prejudice-baiting rhetoric appears to be a calculated, routine feature of counsel's trial strategy." *Ante* at 33. I do not know if that statement is accurate. But what I do know is that it is not an accurate statement *in this case*. No matter what plaintiff's counsel's *routine* may be, this Court should

14

focus only on the facts before us. An impartial review of those facts indicates the behavior of plaintiff's counsel does not warrant a new trial.

## II. EXPERT WITNESS TESTIMONY

I agree with the majority that "MRE 702 has imposed an obligation upon the trial court to ensure that any expert testimony admitted at trial is reliable." *Ante* at 36-37. However, I disagree that the trial court erred in failing to conduct its gatekeeper role in this case.

Stephen Hnat, a fact and expert witness called by plaintiff, testified that he is a clinical social worker, which means he is licensed to perform psychotherapy—both group therapy and individual therapy—primarily for people who have substance abuse disorders, or depressive or emotional disorders. He has worked as a clinical social worker since 1981. Among other positions, Mr. Hnat served as staff therapist and the director of cocaine treatment for Ford Hospital-Maplegrove.

During his testimony, Mr. Hnat clarified that he is not a doctor and that he did not complete his Ph.D. Unlike the majority, I do not find any evidence that Mr. Hnat's misstatement that he possessed a master's degree was intentional. Mr. Hnat entered a doctorate program that he did not complete. It is not unreasonable that, twenty

15

years later, he was unclear about whether he had completed the required paperwork to be awarded his master's degree. I also do not find that, in light of Mr. Hnat's other credentials, the misstatement affected the jury verdict. Mr. Hnat detailed a lengthy career that included consulting with the Michigan Department of Transportation, as well as the Detroit Red Wings, Detroit Tigers, Detroit Lions, and the University of Michigan Athletic Department. Mr. Hnat also served as a consultant to the National Institute of Drug Abuse and served on the President's Task Force for a Drug-Free Workplace. He also conducted research over the years and authored an award-winning video used by numerous corporations. Further, he served as an instructor at the Michigan Judicial Institute and as an adjunct professor at the University of Detroit Mercy. During direct examination, plaintiff's counsel and Mr. Hnat were forthcoming about their past working relationship.

Mr. Hnat first treated plaintiff in 1992. He testified that there is a withdrawal period when an alcoholic stops drinking. The withdrawal period depends on the person and how much the person drank, but "if you stop using alcohol very quickly, your body can be, the brain is overstimulated and you can develop some serious life-

16

threatening complications at that time." Mr. Hnat also testified:

> Alcoholism is, you know, is a progressive disease which ultimately is fatal and it's fatal in a number of different ways unless it's arrested but then it's not fatal but the way that alcoholics or people with addiction generally die are associated with overdoses, accidents because of the effect of the drug and the functioning of the environment. More often than not it's a very slow and painful process as the body begins to break down because of the toxic effects of the chemical, so in the case of alcoholics, the process of dying usually involves the development of some very painful medical complications such as pancreatitis or hepatitis or cirrhosis.[10]

He further explained that alcoholism "continues to capture more of the brain's functions so that the person is, you know, the brain, it becomes more and more focused on getting and using the drug."

Unlike the majority, I do not find this testimony "utterly lacking in scientific support." *Ante* at 19. In short, Mr. Hnat's testimony was that plaintiff was an alcoholic. Stress related to the sexual harassment she suffered while employed by defendant caused plaintiff to start drinking again and suffer from depression, which also exacerbated her drinking.[11] As an alcoholic suffering from

---

[10] Medical records listed various medical conditions suffered by plaintiff, including chronic pancreatitis.

[11] Plaintiff testified:

(continued…)

depression, plaintiff may die from a disease common to alcoholics. Mr. Hnat testified that "for the person who has alcoholism, that kind of stress [from sexual harassment] produces an additional risk not only of emotional distress but of triggering a process of compulsive drug seeking. That the person will, they feel bad, and that sort of natural connection of the brain is I feel bad. I feel like drinking." Medical records signed by various medical professionals indicate that plaintiff suffered "extreme stress in her work environment due to sexual harassment." I do not believe that the trial court abused its discretion in admitting Mr. Hnat's testimony.

---

(…continued)

> It [the harassment] just got worse. And being an alcoholic, sometimes that is the way we cope with things is by going back to the bottle and that is what I did.

> * * *

> I belief [sic] that the daily abuse that I have been subjected to at work has hindered me greatly in being able to remain sober.

In contrast, defense counsel suggested that plaintiff's depression was not the result of repeated sexual harassment at work, but could have been the result of having to depend on other people for transportation.

### III. REMITTITUR

The jury found that plaintiff had been subjected to sexual harassment in violation of the Michigan Civil Rights Act, MCL 37.2101 *et seq.*, and that defendant did not adequately investigate and take prompt and appropriate remedial action. The jury awarded $20 million for mental anguish, physical pain and suffering, fright and shock, denial of social pleasures and enjoyments, embarrassment, humiliation, mortification, shame, anger, chagrin, disappointment, worry, outrage, disability including the loss or impairment of plaintiff's psychological well-being, and the increase in plaintiff's disease of substance abuse arising from an aggravation of a preexisting condition. The jury also awarded $1 million in a trust fund for plaintiff to use for *future medical expenses*; contrary to the majority's assertion, when the jury verdict was read, the jury did not state that this amount was for future earning capacity.

As stated, I believe that the jury's verdict for the plaintiff was amply supported by testimony offered at trial. I also disagree with the majority's statement that "we cannot accept the argument that plaintiff's was the *worst* case of sexual harassment in the history of the country that has resulted in a verdict." *Ante* at 22.

Plaintiff does not have to prove that her case was the worst case of sexual harassment in the history of the country to support the verdict. However, the verdict must be properly supported by the evidence and reviewed to determine

> [1] whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; [2] whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; [3] whether the amount actually awarded is comparable to awards in similar cases within the state and in other jurisdictions. [*Palenkas v Beaumont Hosp*, 432 Mich 527, 532; 443 NW2d 354 (1989).]

On the basis of the evidence introduced at trial and awards in other sexual harassment cases, as detailed by the majority, I believe that the jury award in this case is too great. See *id*. at 538-540; *Precopio v Detroit*, 415 Mich 457, 479; 330 NW2d 802 (1982). While defendant's conduct was reprehensible and plaintiff's suffering indisputable, a review of jury awards in other sexual harassment cases indicates that the jury's award in this case was inappropriate. While a review of other awards cannot serve as an exact indicator and circumstances may certainly justify higher awards than those granted by other juries, the disparity between this award and others involving a single plaintiff indicates that it is not analogous.

20

I stress, however, that I do not believe the matter should be remanded for remittitur on the basis of any misconduct on the part of plaintiff's counsel. The excessively large verdict in plaintiff's favor is attributable solely to the conduct of defendant and defense counsel.[12] In an ironic exchange during the trial, plaintiff's counsel actually predicted the outcome of the case after defense counsel requested a jury instruction regarding plaintiff's lack of mitigation. Defense counsel stated that plaintiff was causing her own medical problems and "could have ameliorated the later incidents [of sexual harassment] which could have harmed her." Plaintiff's

---

[12] In a telling exchange, an employee of the *human resources department* attempted to dismiss plaintiff's complaints of sexual harassment.

> *Q*. She did actually complain to you that she had been the victim of harassment, didn't she?
>
> *A*. Complained no. It was more upon [sic] a conversation.
>
>         * * *
>
> *A*. Like a factfinding thing, like she wants to know what she could do, what avenues she could take, that sort of thing.
>
> *Q*. So she was asking you for advice on what she should do?
>
> *A*. Yes.

counsel stated that defense counsel's argument that plaintiff is responsible for her damages

> is going to pump up the damages in this case when they start blaming [plaintiff]. So, I want the record to reflect I am acceding to this on behalf of my client because it is my firm belief that this would increase the amount of damages that is awarded to my client, rather than decrease them. . . . And I just want to make a record. If we get an astronomical verdict and the Defendant comes back and asks for a remittur [sic], Judge, I want the record to reflect that the Defendant is requesting an instruction that I think would have the effect of further angering the jury and increasing the damages.

While I find plaintiff's counsel's prescience impressive, the excessively high verdict cannot be allowed to stand merely because plaintiff's counsel made a record of defense counsel's woeful error in strategy. Therefore, I would remand this matter to the trial court for remittitur.

## IV. CONCLUSION

Defendant's trial strategy was to question, and minimize, the harassment experienced by plaintiff and blame plaintiff for not being more active in seeking to stop the harassment. This strategy was chosen by defendant and rejected by the jury. Conduct by plaintiff's counsel that is now classified as unacceptable was frequently not objected to by defendant. I do not believe that this Court

22

should now step in to help defendant correct its errors in judgment.  Therefore, I respectfully dissent.

                              Michael F. Cavanagh
                              Elizabeth A. Weaver
                              Marilyn Kelly